NUMBER 13-07-00345-CV 

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG 
                                                                                                                      

IN THE INTEREST OF J.L., A CHILD
 

On appeal from the County Court at Law No. 5 
of Nueces County, Texas.
                                                                                                                      

MEMORANDUM OPINION

Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Justice Yañez
                            
          The trial court terminated the parent-child relationship between appellant, C.R., and
her child, J.L.


 In a post-judgment hearing, the trial court determined that appellant's
appeal is frivolous under section 263.405(d)(3) of the family code.


 Appellant appeals the
trial court's finding that her appeal is frivolous. We affirm.
I. Background
          On August 18, 2004, the Texas Department of Regulatory and Protective Services
(the "Department") filed suit seeking termination of appellant's parental rights to three of
her children, including J.L. J.L.'s two siblings were returned to appellant, and J.L.'s case
was severed.


 On May 14, 2007, a trial was held, and a jury determined that appellant's
parental rights to J.L. should be terminated. On June 11, 2007, the trial court signed an
order terminating appellant's parental rights to J.L. In its termination decree, the trial court
found by clear and convincing evidence that termination was in the child's best interest and
that appellant:
knowingly placed or knowingly allowed the child to remain in conditions or
surroundings which endanger the physical or emotional well-being of the
child[


]

                     . . . .
 
engaged in conduct or knowingly placed the child with persons who engaged
in conduct which endangers the physical or emotional well-being of the
child[


]
 
 . . . .
 
 
constructively abandoned the child who has been in the permanent or
temporary managing conservatorship of [the Department] or an authorized
agency for not less than six months, and;
 
(i) the department or authorized agency has made reasonable efforts to
return the child to the parent; 
 
(ii) the parent has not regularly visited or maintained significant contact with
the child; and 
 
(iii) the parent has demonstrated an inability to provide the child with a safe
environment[


]
 
. . . .
 
failed to comply with the provisions of a court order that specifically
established the actions necessary for the parent to obtain the return of the
child who has been in the permanent or temporary managing
Conservatorship of [the Department] for not less that [sic] nine months as a
result of the child's removal from the parent under Chapter 262 [Procedures
in Suit by Governmental Entity] for the abuse or neglect of the child.[


]

          Appellant filed her statement of points on appeal, and after conducting a hearing
pursuant to section 263.405 of the family code, the trial court concluded that appellant's
appeal was frivolous under section 13.003(b) of the civil practices and remedies code.


 In
its order, the trial court found that appellant had not presented a substantial question for
appellate review, appellant had effective counsel, and by appellant's "own testimony
presented evidence clear and convincing to establish all of the statutory grounds for
termination offered by [the Department]." The reporter's record of the frivolousness
hearing was filed with this Court; however, because the trial court determined that
appellant's appeal was frivolous, appellant was not entitled to a free reporter's record of
the termination trial.


 Appellant asked this Court to order the filing of the reporter's record
of the termination hearing. After considering appellant's request, we concluded that we
lacked sufficient evidence to apply the appropriate standards of review to determine
whether appellant's appeal was frivolous and ordered the preparation of a free reporter's
record of the termination hearing, which has been filed with this Court.



II. Frivolous Finding
          In order to appeal the termination of parental rights, a parent must file "a statement
of the point or points on which the party intends to appeal."


 After a parent has filed her
statement of appellate points, pursuant to section 263.405(d), the trial court is required to
conduct a hearing to determine, among other things, whether the appeal is frivolous as
provided by section 13.003(b) of the civil practices and remedies code.


 One statutory
consequence of a frivolousness determination is that the scope of appellate review is
initially limited to the frivolousness finding.



          An appeal is frivolous if there are no substantial questions for appellate review.


 
Furthermore, an appeal is frivolous "when it lacks an arguable basis whether in law or in
fact."


 An appellate court reviews the trial court's determination that an appeal is frivolous
under an abuse of discretion standard of review.


 "The test for abuse of discretion is
'whether the court acted without reference to any guiding rules and principles' or, stated
another way, whether its decision was arbitrary or unreasonable."



A. Legal and Factual Sufficiency



          Appellant's first three points of appeal challenge the legal and factual sufficiency of
the evidence supporting the termination of her parental rights. The trial court concluded 
that appellant's points did not present a substantial question for appellate review. On
appeal, appellant challenges the trial court's determination.
1. Applicable Law
          "When the trial court conducts a frivolousness hearing on an appellant's proposed
legal and factual sufficiency issues, the trial court should apply the [applicable] standard[s]
of review."


 In reviewing the legal sufficiency of the evidence supporting parental
termination, the evidence is viewed in the light most favorable to the finding to determine
whether a reasonable trier of fact could have formed a firm belief or conviction that its
finding was true.


 In a factual sufficiency review, the court must determine whether, on
the entire record, a reasonable trier of fact could have formed a firm belief or conviction
that its finding was true by considering whether a reasonable factfinder could not have
resolved disputed evidence in favor of its finding.



          Therefore, the question in this case is whether the trial court abused its discretion
by determining that the evidence was such that a factfinder could reasonably form a firm
belief or conviction that appellant violated section 161.001(1) and that termination is in
J.L.'s best interest.



2. The Evidence
          On May 14-16, 2007, a jury trial on the merits was held. At the trial, the Department
presented the testimony, of among others, John Marez, Tracey McZeal, Dennie Janz,
Susan Brezina, appellant, and Trudy Stapleton.



          Marez, a supervisor with the Department, testified that, in his former position as an
investigator, he received a report of alleged medical neglect regarding J.L. Marez visited
appellant's home to assess J.L.'s situation. According to Marez, J.L., who was
approximately six months old at the time, was "hooked up to numerous apparatus." Marez
stated that J.L had a tracheotomy and that there was a tube that he received medication
through—a machine that "help[ed] [J.L.] with his breathing." Marez explained that although
J.L. had home nurse providers, appellant was responsible for administering J.L.'s
medication when the nurses left her home. The nurses were present with J.L. from 8:00
a.m until 5:00 p.m.



          Marez noted that when the nurses left and appellant became responsible for J.L.'s
care, appellant failed to administer J.L.'s medication. Marez stated, "[The nurses] would
leave medication for overnight treatments and [the medication] would still be there in the
same little vial or container. Never opened, never used, so that was obviously a concern
as we observed the case throughout [the investigation of four months]." Marez explained
that from a month's supply of medication, he observed up to two weeks of unused
medication that had expired—medication that J.L. needed that he had not received during
that month. Marez stated that it was "obvious" that appellant was not providing the
medication to J.L. when she was caring for him. On cross-examination by the attorney ad
litem, Marez testified that appellant, in addition to failing to give J.L. his medication, failed
to take J.L. to his doctor's appointments.
          According to Marez, the condition of the home was a concern for the Department
because J.L. was "fragile" and required specific medical care. Marez stated that J.L.
needed a "clean environment," so he discussed the condition of the home with appellant. 
Marez testified that
the home was—was in disarray. There was a lot of trash and clutter
throughout the home. . . .  I discovered that there were more—there was
more clutter and more trash in each room, including the room that had [J.L.]. 
He was hooked up to his equipment . . . there was clutter in that room as
well. So, it was very concerning, very alarming, and so I made an
assessment based on that, initially.

The Department asked appellant to clean the home, and on a follow-up visit, Marez found
that appellant had made some progress at cleaning up; however, "there was still clutter in
their home" and based on the fact that nurses cared for J.L during the day, Marez believed
that appellant was "not using that time to clean the home, and [was] not really sure what
[appellant] was using that time for."


 Marez stated that during contacts he or other
professionals had with the family, the children had not been bathed, the children were
wearing dirty clothes, and diapers had not been changed and "were totally soiled and
sagging."
          Marez testified that, eventually, the Department determined that it would be in J.L.'s
best interest if he were removed from appellant's home "because it appeared that the
parents were not providing [proper medical care]." According to Marez, the Department
was concerned because J.L.'s parents were not providing "proper attention to his medical
needs," and the Department was concerned that appellant would not "follow through" with
a major surgery J.L. was scheduled to have. Marez testified that although appellant did
not take J.L to his doctor's appointments, she did transport him to Houston to visit family
members. In Marez's opinion, that act endangered J.L. because appellant transported J.L.
"away" from his medical providers.
          McZeal, a conservatorship caseworker with the Department, testified that she
becomes involved in a case once the child has been removed from the home in order to
"try to reunite the child with the family" or provide appropriate placement if the parent-child
relationship is terminated. McZeal explained that J.L. is unable to eat any solid foods
because he has Pierre Robin Syndrome, which is a malformation of the jaw. J.L. has a
tracheotomy and a "G button," which is used to feed J.L. liquids directly into his stomach. 
According to McZeal, J.L. is unable to chew and even chokes on water. J.L. is unable to
move his tongue, which can "obstruct his airway and he can die."
          Prior to McZeal's involvement, J.L. was removed from appellant's home (the original
removal) and placed in foster care. While in foster care, J.L. received physical therapy,
occupational therapy, speech therapy, and was transported by ambulance to his
appointments. When McZeal became involved in J.L.'s case in 2005, the trial court had
ordered J.L. returned to appellant's home. When J.L. was returned, appellant was
supposed to arrange for these services to continue for J.L. However, according to McZeal,
appellant never made the appointments, even though the therapy would be provided in
appellant's home. McZeal stated, "[A]ll [appellant] needed to do was make the phone call
to set it up so [the therapists could] come out to [appellant's] home . . . and there was a 30
day lapse in services because it wasn't done."
          McZeal testified that appellant allowed J.L.'s Medicaid to lapse. According to
McZeal, she had asked appellant on numerous occasions if she had applied for Medicaid,
and appellant insisted she had. McZeal stated that she told appellant that one of the
Department's "workers" could help her with the paperwork, but appellant said the
application had already been completed. Because of the lapse in J.L.'s Medicaid, a
scheduled surgery had to be postponed. Furthermore, when the Medicaid lapsed, the
medical supply company threatened to pick up J.L.'s medical equipment. According to
McZeal, without that equipment, J.L. would have died. McZeal stated that three different
organizations informed her that J.L. was no longer receiving Medicaid. J.L.'s case was
transferred to the "Intensive Family Preservation" ("IFP") unit that enables the Department
to place caseworkers in the home whenever necessary.


 Then, according to McZeal, after
the IFP worked with appellant for approximately two months, J.L. was removed from
appellant's home again (the second removal) due to "home conditions" that were not
"conducive to his medical condition."



          Once the second removal occurred, the case was returned to McZeal, and J.L. was
placed in foster care in Corpus Christi, Texas. J.L. remained in that placement from
August 2005 until November 2006.


 According to McZeal, appellant was allowed weekly
visitation with J.L. while he was in foster care; however, appellant was not able to make her
visitation for many reasons. McZeal stated that appellant had transportation issues, and 
if she was able to visit by bus from Robstown, Texas, she was thirty to forty-five minutes
late. In December 2005, appellant moved from the Corpus Christi area to Houston. 
McZeal testified that appellant informed her that appellant was going to Houston for the
holidays; however, appellant did not return from Houston. McZeal thought that "something
may have occurred between [appellant] and [J.L.'s father] that caused her not to return." 
According to McZeal, she discovered that appellant had moved to Houston when a "CASA"
worker informed her that appellant had been evicted from her home.


 Subsequently,
McZeal received a phone call from appellant informing her of appellant's move to Houston.
          McZeal stated that, according to the family plan, appellant was required to: (1)
attend twelve sessions of parenting classes to be conducted in her home; (2) attend
counseling sessions to be conducted in her home; (3) attend regular visitation; and (4)
ensure that there was a stable and clean home environment for J.L. The trial court also
ordered appellant to pay monthly child support payments for J.L. Appellant only attended
two sessions of parenting classes and counseling; on the third session, when the parenting
teacher arrived at appellant's home, appellant had gone to Houston. According to McZeal,
from August 2005 until December 2005, appellant visited J.L. "very few times," and from
December 2005 until May 2007, appellant visited J.L twice. On cross-examination by
appellant's counsel, McZeal was asked how a parent who has transportation and financial
problems "is supposed to visit their child." McZeal responded that in this case, appellant
had been cashing J.L.'s monthly social security disability checks for the last "two and a half
years" and that appellant could have used those funds to visit J.L.



          According to McZeal, the parenting plan required a clean environment for J.L.
because of his medical conditions. McZeal stated, "[J.L.] has respiratory problems. Also,
since he's not allowed to have anything by mouth, then it becomes a problem because we
had a toddler at the time that was able to grasp things and put it in his mouth, and anything
that goes in his mouth could kill him." As part of keeping the environment clean for J.L.,
appellant was asked to remove her cat and kittens from the home. According to McZeal,
cat fur had become "trapped in [J.L.'s medical] machines, and that could go into his system
and cause problems, infections and choking." Appellant failed to remove the cats from her
home. On cross-examination by appellant's counsel, McZeal repeated that cat hair "got
into" J.L.'s medical machine and that there was "all kinds of debris; roaches, cat hair,
things like that in [J.L.'s] medical equipment."
          McZeal testified that at one visitation in May 2006, J.L. ate a "Cheeto" from
appellant's purse and began choking. Jantz, J.L.'s foster parent, described the event in
detail. Jantz stated that the nurses took J.L., who was coughing, into a room to perform
a procedure to remove something from J.L.'s lungs. According to Jantz, the nurses
suctioned orange fluid with "chunks that appeared to be Cheetos" from J.L.'s lungs. Jantz
testified that it was determined that J.L. had acquired a bag of Cheetos from appellant
during the visit. According to Jantz, the situation was extremely dangerous because J.L.
could have stopped breathing and died due to aspiration.


 Jantz testified that he always
emphasized that appellant should not allow J.L. to eat or drink anything because it was
dangerous; however, Jantz suspected that on other visitations, appellant gave J.L. a drink
of "whatever the other kids were drinking."
          Jantz explained that J.L. had several items of medical equipment including: (1) a
machine that provided a mist to J.L.'s tracheotomy at night; (2) a suction machine; and (3)
a machine that vibrates J.L.'s lungs to loosen secretions. J.L. was given medication three
times daily.


 Jantz stated that they used the suction machine in combination with saline
"bullets" twelve times daily. If they did not provide the necessary suctioning to J.L.'s lungs,
he could have stopped breathing or acquired an infection from the secretions in his lungs. 
Jantz stated that when J.L. was placed in Jantz's care, J.L.'s condition was "poor," J.L. and
his equipment were dirty, and J.L. "hadn't been taken care of." According to Jantz, after
his wife suctioned J.L.'s lungs for the first time, they found a cockroach in the tubing. Jantz
stated that they then took all of the equipment outside and while cleaning the equipment,
found "roaches."
          Brezina, a member of the Department's IFP unit, testified that when she became
involved in J.L.'s case, the Department believed that there was "some imminent danger"
to J.L. Brezina stated:
Well, going into the case, there was [sic] some preexisting problems. There
had been police for domestic violence, there had been police because there
[sic] five year old was left home alone without any adult supervision, so that's
of course a concern when you are dealing with a medically fragile infant with
that kind of bad choices by the parents. Then there was the issue of little
[J.L.]. He needed both jaw surgery and eye surgery, and neither of them
were taking place. . . .  [T]he surgery was scheduled for July, and [appellant]
let her Medicaid lapse. . . .  So, [the Department] had— first of all, had to get
her Medicaid reinstated which I explained to [appellant] . . . is a free
government service. This is inappropriate that you let the Medicaid lapse on
a medically fragile child. Then there was the issue of medications. Once I
got the case—What I do, is I check the medications, and they had a home
health nurse. . . .  The first thing I did was check the medications with the
nurse's log, and the dates, and one of the medications had expired and was
two-thirds full. And the other medications, when I checked the milligrams,
that they corresponded with the nurses' log, when [the nurses] gave the
medications, but there was no medication given outside that. There's—you
know, there is way too much medication in those bottles, and I explained to
[appellant] that he had to be on this medication, that it was very important.
 
And then in talking with the doctor's office for the eye surgery, I ended
up setting up the appointments, and they were very frustrated, and—and
[appellant] was inconsistent with her appointments . . . she missed
appointments, she wouldn't reschedule appointments.

According to Brezina, she finally made the doctors' appointments for J.L. because
appellant failed to do it, and Brezina made sure that J.L. was at his appointments, which
she attended. Brezina stated that J.L. was required to wear his glasses at all times except
when sleeping or swimming and was supposed to wear an eye patch at least four hours
per day so that his eye surgery would be successful. However, Brezina discovered that
appellant had not purchased any eye patches for J.L. and did not make J.L. wear his
glasses, which appellant had difficulty finding.
          According to Brezina, the "roach problem" was "overwhelming" because when she
visited appellant's home, the cockroaches were crawling over her feet and it was a
"massive infestation." When J.L. was on the floor, the cockroaches were crawling on his
hands and then he would touch his tracheotomy. Brezina testified that when she removed
J.L.'s medical equipment from appellant's home, cockroaches crawled out of his "breathing
machine" that had been connected to his tracheotomy. Brezina stated that she explained
to appellant that roaches carry diseases and germs and that she needed to scrub the
"filthy" floor once a day. Brezina also observed that J.L.'s diaper was "never" changed and
that the diaper was "sopping wet and hanging on him." Brezina stated that the safety plan
required appellant to remove the cats from her home because cat fur had been found in
J.L.'s medical equipment; however, when Brezina made unannounced visits, she found the
cats inside appellant's home. On cross-examination by the attorney ad litem, Brezina
testified that she believed that J.L. was in imminent danger due to the condition of
appellant's home and appellant's inability to provide J.L.'s daily medical care, including
keeping medical appointments.
          Appellant testified that she has lived in Houston for approximately one year and has
three children, including J.L., who was four years old at the time of trial. Appellant stated
that since she moved to Houston, she has visited J.L. four or five times, but she did not
know the exact dates; the last time she saw J.L. was "before November" of 2006.


 J.L.
was moved to Temple, Texas, and according to appellant, she has not visited him in
Temple because she does not know how to get there. Appellant admitted that she had
been receiving J.L.'s social security check and cashing it to cover her expenses to and
from her court appointments in Corpus Christi. Appellant was receiving five hundred
twenty-one dollars per month for J.L. after he had been removed from her home. Appellant
did not recall when she stopped receiving J.L.'s social security checks, but thought the
checks stopped sometime in 2006. Appellant acknowledged that the money did not belong
to her and admitted that she spent it on her other children and on her travels to Corpus
Christi.
          Appellant was not aware of when J.L. had been removed from her home and
claimed that the Department did not give her a reason for J.L.'s removal; however, she also
stated that she believed that Marez removed J.L. from her care because he thought that
"she was gonna run with him." According to appellant, her home was "cluttered" because
she had moved from one apartment unit to another. Appellant also did not recall whether
the Department had given her a list of things she needed to do in order to have J.L.
returned to her. She also did not remember receiving a "Family Plan of Service" from the
Department. When counsel for the Department showed appellant a copy of the "Family
Plan of Service" with her signature, appellant recalled that it was the "stuff" that she was
required to do in order for her children to be returned to her. Appellant explained that the
"Family Plan of Service" required that she provide a "safe environment" for her children
and for her to attend parenting class and counseling. Appellant stated that she was
required to attend twelve parenting classes, but she only completed five sessions. She
explained that she did not complete the counseling because her counselor stopped visiting
her. Appellant claimed that she was not aware of how much child support she was
required to pay. However, after reviewing the "Family Plan of Service," appellant agreed
that the court ordered her to pay five dollars per month, and she admitted she did not pay
any child support.
          Appellant stated that she was not told that the cat needed to be removed and that
the cat was not a problem because it stayed in the living room and J.L. never left his
bedroom. Appellant testified that she had a pest problem because she lived next to a field
and that "everyone was having problems with roaches and rats." However, appellant
insisted that when Jantz received J.L.'s medical equipment, it was clean and new. 
According to appellant, when J.L. ate a Cheeto from her purse, he was fine when he left,
and appellant did not "know where [Jantz was] saying that [J.L.] had choked" because after
he ate the Cheeto, "he started playing and he was doing fine, doing normal stuff, like a
normal child, just playing, doing everything." Appellant explained that J.L.'s surgery was
not postponed because the Medicaid lapsed but because the doctor did not perform
surgeries on Tuesdays and had to reschedule.
          Appellant was unable to explain J.L.'s medical condition and did not know what
medications he was required to take or the amount he needed. On cross-examination by
the attorney ad litem, appellant agreed that she was overwhelmed with J.L. and that she
may have missed "a couple nebulizer treatments," and possibly had not given him his
medication at night. The attorney ad litem asked appellant if it was healthy for J.L. to be
confined to his bedroom, and she replied, "No, but [a nurse] said I had to keep him in the
room, he couldn't come out in the living room where we were, he had to stay back there
with the nurses, where all of the machines were."



          Stapleton, the CASA for J.L., testified that in her opinion, it is in J.L.'s best interest
for appellant's parental rights to J.L. be terminated because she would "fear for his life" if
he were returned to appellant. On cross-examination by the attorney ad litem, Stapleton
stated that J.L.'s current foster parents were "willing to keep him permanently" and in her
opinion, this environment would be conducive to his physical health. According to
Stapleton, J.L. appeared to be "thriving," and his foster parents provided the medical care
that J.L. needs.
          The jury was instructed that it could terminate appellant's parental rights if it found
by clear and convincing evidence that appellant had violated one of four statutory grounds
alleged. The evidence showed that appellant: (1) failed to provide adequate medical care
for J.L. and allowed him to remain in a home that was dangerous to his physical health; (2)
failed to visit J.L. or maintain contact with J.L. while he was in the Department's
conservatorship; and (3) failed to comply with the court order to pay child support and
attend parenting classes. Based on our review of the record, we conclude that the
evidence is such that the jury as factfinder could have reasonably formed a firm belief or
conviction that appellant violated one or more of the alleged statutory grounds and that
termination of appellant's parental rights was in J.L.'s best interest.


 Therefore, the trial
court did not abuse its discretion by determining that appellant's appeal was frivolous as
to her legal and factual sufficiency complaints.
B. Ineffective Assistance of Counsel
          In her final point on appeal, appellant claimed that trial counsel rendered ineffective
assistance. However, because our review is limited to the frivolous determination,


 the
issue is whether the trial court abused its discretion by determining that appellant's
ineffective assistance claim is frivolous.
          A claim of ineffective assistance of counsel is established if the appellant shows that
counsel's performance was deficient and the appellant was prejudiced by counsel's
performance.


 There is a strong presumption that counsel rendered reasonably
professional assistance.


 Therefore, appellant must establish by a preponderance of the
evidence that counsel's performance fell below an objective standard of prevailing
professional norms and that there is a reasonable probability that but for counsel's
deficiency, the result of the proceeding would have been different.



          An allegation of ineffective assistance of counsel must be firmly founded in the
record, and the record must affirmatively demonstrate the alleged ineffectiveness.


 If the
record is silent regarding the basis of an ineffective assistance complaint, an appellate
court may not speculate on the reason for counsel's act or omission.



          Appellant complains that trial counsel failed to object to the Department's failure to
file a witness list. At the frivolousness hearing, appellant presented no evidence supporting
her assertion that trial counsel rendered ineffective assistance, including testimony from
her trial counsel concerning the reason for his alleged omission.
          Appellant has the burden of rebutting the presumption that trial counsel's actions
and decisions were reasonably professional and motivated by sound trial strategy.


 
Absent evidence in which trial counsel explains his actions, our assessment of counsel's
strategy would call for impermissible speculation.


 Appellant has not rebutted the strong
presumption that trial counsel rendered reasonably professional assistance.


 There is
nothing in the record to show that trial counsel was not motivated by sound trial strategy. 
Furthermore, trial counsel did object to one of the Department's witnesses, arguing that
the witness was a surprise; as a result, that witness did not testify. Because the record
does not affirmatively demonstrate that counsel's overall performance was deficient, we
do not reach the prejudice prong of the Strickland test.


 Therefore, we conclude that the
trial court did not abuse its discretion in determining that appellant's appeal was frivolous
as to her ineffective assistance of counsel complaint.
III. Conclusion
          We affirm.
 
 
 
 LINDA R. YAÑEZ
 Justice



Delivered and filed 
the 4th day of March, 2010.